Argued February 5, affirmed April 14, 1925.

# HELEN WELLS *v.* CLARK & WILSON LBR. CO.

### (235 Pac. 283.)

**Master and Servant—Holder of Employment Card Held not "Employee" but Invitee.**

1. Where plaintiff, seeking employment, had received an employment card from an employment agency directing her to go to defendant's logging camp, and pursuant to instructions on such card plaintiff took a train to terminus of logging road, and was taken from there to camp on defendant's logging train, and was injured immediately after getting off of logging train, *held* that under a proper construction of Sections 6619, 6730–6733, Or. L., plaintiff was not an "employee" of defendant at time of her injury, but an invitee, to whom defendant owed duty of exercising reasonable care to protect from injury.

**Contracts—Construction of Written Contract Question of Law.**

2. The construction of a contract of an employment agency, which was in writing, is a question of law.

**Negligence—Negligence as to Invitee Held for Jury.**

3. Where plaintiff, at time of her injury on defendant's premises, was an invitee, whether defendant exercised reasonable care required to protect plaintiff from injury was question for jury.

**Damages—Evidence—Common Knowledge That Large Incisions into Abdominal Walls Dangerous to Person Operated upon.**

4. It is common knowledge that large incisions into walls of abdomen are operations attended with danger to person operated on, and an injured person is not required to make any considerable risk of life with view to being ultimately and perfectly restored.

**Damages—Instruction in Personal Injury Action Held to have Sufficiently Presented Defendant's Contention That Operation Would Obviate Plaintiff's Injury.**

5. In action for injuries resulting in hernia, court's instructions *held* to have sufficiently presented defendant's theory that an operation would likely obviate injuries which plaintiff sustained.

**Trial—General Exception to All Requested Instructions not Given Insufficient.**

6. A general exception by defendant to all requested instructions not given does not apprise court of particular point defendant has in

---

1. See 18 R. C. L. 576; 20 R. C. L. 55.
2. See 6 R. C. L. 862.
3. See 20 R. C. L. 56.
4. See 15 R. C. L. 1101.
6. See 14 R. C. L. 809.

mind, or as to which requested instructions defendant believes are not sufficiently covered in general charges.

**Damages—Instruction Requiring Plaintiff to Submit to Surgical Operation, if Relief "Reasonably Possible," Properly Refused.**

7. Requested instruction requiring plaintiff, suing for injuries resulting in hernia, to submit to a surgical operation, if relief seemed "reasonably possible," was properly refused, as plaintiff was not required to risk her life with view to being utterly restored.

**Trial—Requested Instruction as to Necessity of Personal Injury Plaintiff to Submit to Operation Properly Refused, Where Element of Risk not Mentioned.**

8. In action for personal injuries resulting in hernia, requested instruction that fact that plaintiff feared effects of operation would not justify her refusal to submit to one if an operation was offered her or within her means was properly refused, in that it left out the element of risk on part of plaintiff.

**Trial—Requested Instruction That Injury Which Healed Within Reasonable Time or is Subject to Removal by Operation not Permanent Injury Held Properly Refused.**

9. In action for personal injuries resulting in hernia, requested instruction that an injury which healed within a reasonable time, or is subject to removal by operation, is not a permanent injury, and that a plaintiff so situated cannot recover for permanent injuries, was properly refused, where there is no evidence that injury would heal within a reasonable time without a surgical operation and, further, because it left out element of risk to plaintiff.

**Trial—Advisability of Instruction Deprecating Quotient Verdict Discretionary With Trial Court.**

10. Instruction deprecating quotient verdict is designated a cautionary instruction, giving or refusal of which is within discretion of trial court, and error cannot be predicated on refusal to give.

**Trial—Verdict not Vitiated Because Arrived at by Striking Average of Individual Estimates, if Result not Made Binding on Jurors.**

11. That verdict was arrived at by striking an average of estimates of each individual juror does not vitiate verdict, if jurors did not bind themselves to abide by such result beforehand.

See (1) Workmen's Compensation Acts, 40 Cyc. 47; 29 Cyc. 456, (2) 13 C. J. 783. (3) 29 Cyc. 635. (4) 17 C. J. 779; 23 C. J. 148 (1926 Anno.). (5) 17 C. J. 1074. (6) 38 Cyc. 1803. (7) 17 C. J. 1074. (8) 38 Cyc. 1633. (9) 38 Cyc. 1619. (10) 38 Cyc. 1762. (11) 38 Cyc. 1845.

From Multnomah: GEORGE W. STAPLETON, Judge.

8. See 14 R. C. L. 800.
10. See 14 R. C. L. 749.
11. See 27 R. C. L. 847, 849.

Department 2.

This is an action to recover for alleged personal injuries received by plaintiff on account of the alleged negligence of the defendant.

The complaint, omitting formal parts, alleges that on the twenty-ninth day of December, 1922, plaintiff applied to the Northwest Employment Service for a situation as a waitress, and that she was directed by said agency to go to defendant's logging camp, near Goble, Oregon, where she would find employment as a camp waitress; she was instructed to take the Spokane, Portland and Seattle Railway train to Nehalem Junction, at which point the defendant would furnish her with transportation over its railroad to the logging camp; that in pursuance to and in accordance with said instructions plaintiff did, on December 30, 1922, go to Nehalem Junction, and upon her arrival there the defendant directed her to board the engine on defendant's railroad and be transported to defendant's logging camp; that in accordance with said instructions she boarded the engine of defendant's railway at about the hour of 7 o'clock P. M., and arrived at defendant's logging camp about 9 o'clock, it being very dark and rainy weather; that upon her arrival at the logging camp the defendant instructed plaintiff and the other parties on said engine to leave the engine and step on to the platform, and in so doing they were assisted by the defendant's superintendent, the plaintiff being the first one to leave the engine; that the said superintendent instructed plaintiff to step back so as to make room for the other parties and plaintiff accordingly did so and in so doing suddenly fell backward off said platform upon a pile of wood and sustained the personal injuries

alleged in the complaint. It is alleged that the platform upon which the plaintiff was directed to land was very narrow, that the engine had stopped at the farther end of it, and that, on account of the intense darkness and rainy weather it was impossible for the plaintiff to know or see the size or dimensions of the platform; that the defendant had given her no warning or indication of it, or of the dangerous place she occupied under the conditions, and that she stepped backward a few feet on said platform and suddenly fell backward off the platform upon a pile of wood, whereby the entire back part of her body was severely bruised and she struck more particularly on her buttocks, which caused her to have two hernias, one on the right and the other in the center of her abdomen, and her whole nervous system was severely shocked, all of which have ever since caused her great pain, suffering and mental anguish; that said injuries in the future and for the rest of her life give her pain, suffering and mental anguish; that said injuries are permanent and will permanently disable the plaintiff; that the proximate cause of the accident was wholly due to defendant's carelessness and negligence in directing and permitting plaintiff to land from the engine upon said small and narrow platform on a very dark and rainy night without giving her any warning or notice of her dangerous position, or taking any precaution to avoid the accident; that prior to said accident and the injuries sustained by plaintiff she was a healthy, able-bodied and strong woman, capable of, and she did do hard manual labor, which she cannot do since said accident and injuries without suffering pain and inconvenience. Plaintiff claimed damages in the sum of $20,000.

On March 12, 1924, the defendant filed an amended answer, denying each and every allegation of the complaint but admitting, in a subsequent paragraph, its corporate. capacity, and admitting that on December 30, 1922, by agreement with the Northwest Employment Service at Portland, Oregon, Helen Wells, together with other persons engaged to take part in logging operations for defendant and was sent to Goble, Columbia County, Oregon, a place at or near the junction of the Spokane, Portland & Seattle Railway with a railroad owned by defendant, to wit, the Goble, Nehalem & Pacific Railroad, which junction is known as the Nehalem Junction and at which place plaintiff did find employment as such camp waitress with defendant and defendant did then and there, in accordance with said contract, secure the right to direct and control the services of the plaintiff, and that thereupon, from and after 3 o'clock of the afternoon of December 30, 1922, the relationship of employer and employee existed between the defendant and the plaintiff and continued to February 14, 1923; that, in accordance with said contract and relationship the defendant did, on said day, convey the plaintiff on one of its locomotives from said Nehalem Junction to the logging camp of the defendant and that upon arriving at defendant's logging camp plaintiff and other parties on said engine did leave said engine and step upon the platform at said logging camp, and that at no time since the said thirtieth day of December, 1922, to the service of the complaint in this cause upon defendant did plaintiff make any complaint or make any claim or give any notice with reference to any injury or accident happening to plaintiff at or between December 30, 1922, and February 14, 1923, both dates in-

clusive, nor did plaintiff make any complaint or give any notice to any officer or representative of the defendant concerning any hernia or other like injury by reason of any accident at any time between said last-named dates or at all, from the time plaintiff was conveyed from said Nehalem Junction on December 30, 1922, to and including the fourteenth day of February, 1923.

For a further answer defendant alleged that at about the dates mentioned in the complaint it was conducting its business under the provisions of the Workmen's Compensation Act; that the logging road upon which plaintiff traveled to the defendant's camp was privately owned and operated by defendant and used for the primary purpose of hauling logs from defendant's point of operation in the woods to the river where said logs could be floated, and defendant never has carried and does not now carry passengers for hire, and is not a common carrier, but, on the contrary, said logging road at all times has been used for the sole purpose of transporting logs belonging to defendant and not for the purpose of carrying passengers or defendant's employees for hire or for gain; that at the inland terminus of said logging road owned and operated by the defendant there was on said thirtieth day of December, 1922, and thereafter during the months of January and February, 1923, a logging camp in said Columbia County owned and operated by defendant; that at said logging camp there was located all the usual apparatus incident to a logging camp including sleeping quarters, cook-houses and dining-rooms, and that at said place logging operations were conducted under the provisions of the Workmen's Compensation Act of the State of Oregon relating to hazardous

employments, which operation, business and employment the defendant was engaged in during the months of December, 1922, and January and February, 1923, and for which business the defendant employed the plaintiff, Helen Wells, and others as before stated; that on the thirtieth day of December, 1922, plaintiff with others, applied to defendant for work as camp waitress in defendant's logging operations being carried on at the logging camp of defendant in Columbia County, Oregon; that plaintiff represented herself to be a camp waitress and was sent to defendant by the Northwest Employment Service under commission from defendant and in and by an agreement with said Northwest Employment Service was directed to go to defendant at Nehalem Junction, when plaintiff would and did engage to furnish her services subject to the direction and control of the defendant, and the defendant then and there contracted for the services of plaintiff and secured the right to direct and control the services of plaintiff; that by said agreement it was provided that plaintiff should be enabled to secure a situation with defendant at Goble, Oregon, as a waitress under a salary of $55 a month, in addition to board and lodging, and that thereupon plaintiff on December 30, 1922, did present herself to defendant at Goble, or particularly said Nehalem Junction, which is a short distance east of the town of Goble; that plaintiff presented herself at about 3 o'clock in the afternoon of said day at said Nehalem Junction, whereupon, at said time and place, an agreement was entered into between plaintiff and defendant wherein and whereby defendant contracted for and secured the right to direct and control the services of plaintiff and other persons, and plaintiff and said other persons engaged to fur-

nish and did furnish her and their services, subject to the direction and control of defendant, and thereupon the relationship of employer and employee was entered into by and between defendant and plaintiff, and said relationship continued from said time, to wit, December 30, 1922, at the hour of 3 o'clock in the afternoon, to and including the fourteenth day of February, 1923, both dates inclusive, and plaintiff was then and there employed by defendant to work for defendant as a camp waitress, and that any injury occurring to plaintiff between said dates happened after said contract of employment had been entered into, and that, in particular, any injury happening to plaintiff after the locomotive stopped and plaintiff had left the engine and gone upon the platform at the logging camp of defendant was an injury after plaintiff had arrived at her destination and when on the premises, after plaintiff had reported to the officers of defendant and had begun and was actually engaged as an employee of the defendant under the orders of the officers of defendant, and that the place at which the injury is alleged to have occurred was brought within the contract of employment by the requirement of its use by the plaintiff, and that any injury happening after 3 P. M., on said December 30, 1922, arose out of and was incident to plaintiff's employment as the employee of defendant.

In a second and separate offense the same matters were alleged and it was further alleged that whatever injury plaintiff may have received arose out of and was incident to and was in the course of her employment as an employee of the defendant engaged in logging operations within the purview of the hazardous occupations defined in the Workmen's Compensation Law of the State of Oregon the compliance

to which law was specifically alleged. Another separate defense was a plea of contributory negligence.

The new matter and all of these defenses being put in issue by the reply, the cause came on for hearing. At the conclusion of plaintiff's testimony, the defendant moved for a judgment of nonsuit, which was denied, and at the conclusion of all the testimony there was a motion for a directed verdict in favor of defendant, which was also denied, and the jury returned a verdict in favor of the plaintiff for $6,500, for which sum judgment was given. Defendant appeals to this court.

The evidence introduced by plaintiff tended to show that on the twenty-ninth day of December, 1922, she applied to the Northwest Employment Service for employment as a waitress and received an employment slip, which is as follows:

"Phone Broadway 5248.                No. 6659.
"S. E. Tanney, Mgr.        T. E. Lambert, Office Mgr.
"Northwest Employment Service,
"222–224 Couch Street.

"Portland, Oregon, Dec. 29, 1922.
"Received from Helen Wells the sum of $2 for which we agree to furnish the correct information by which the above-named employee shall be enabled to secure a situation with Clark-Wilson Lbr. —— at Goble as waitress. Wages $55 per mo. Board $—— per week/meal. Hospital as charged per month. Failing to do which, we promise to refund the above amount paid and the fare for transportation (unless such fare is furnished or offered the employee) to and from the place where said applicant is sent by said agent, on return of this receipt, together with a written statement from the employer or other evidence that the applicant has applied in person, at the place

to which he is directed herein, and to the person to whom he is directed herein, or his agent, and could not get the situation. If the employee is discharged within two days we promise to refund the amount paid as fee and if the employee is discharged after two days and within six days, we promise to refund one-half of said fee, unless he be discharged by reason of intoxication or other good and sufficient cause.—State Law.

"Rules of this office—Applicant must report on time and go without delay to the place to be employed. If the applicant does not secure position he must notify office at once, and return ticket for refund within 30 days.

"He must furnish own blankets and all baggage must be checked, and checks sent to employer when required. Not responsible for baggage. Any class of labor work. Day or night shift. Employers read this ticket.

"No money refunded on this ticket on failure to get out on job.

"I am over 18 years old.

"Signature of employee:

"[Signed] HELEN WELLS.

"Not transferable.

"Report at this office for directions at —— M.

"No verbal agreement in addition to this ticket.

"Pay own fare $——.

"NORTHWEST EMPLOYMENT SERVICE,

"By S. E. T.

(Reverse side:)

"Directions to Work.

"Take the —— at —— from —— to A. M. ——P. M. Report to ——.

"To the employer.

"(Kindly fill out the blank below and return this receipt to the applicant in case you do not employ him, or if he is discharged for any reason within six days after being employed.)

"State clearly whether applicant was discharged or quit position of his own accord, how long applicant worked, and if applicant was discharged or quit; state fully and clearly facts and reasons therefor.

"Place———.   Date———192—.

$$\overline{\hspace{4cm}},$$

"Employer."

Plaintiff's testimony indicated that in pursuance to the directions in this employment slip, on the next day, December 30, 1922, she took the Spokane, Portland & Seattle Railway train between Portland and Astoria and purchased a ticket at her own expense to Goble, and, in pursuance to verbal instructions, got off at Nehalem Junction, a short distance east of Goble, said Nehalem Junction being the terminus of defendant's logging road which is not a common carrier or engaged in the transportation of passengers for hire; that the person in charge of the railway tower at the junction, after ascertaining that plaintiff had the employment slip shown above, directed her some time in the evening to go aboard the cab attached to the locomotive of defendant and gave her a card purporting to pass her without charge to defendant's logging camp with a provision on her part waiving all claim for damages for injuries while traveling on defendant's train; that when she arrived at the platform at defendant's logging camp she was assisted by someone acting on behalf of the company from the cab to the platform, which was dark excepting for a single lantern, and was told to step back so as to give room for other parties to disembark from the train, and stepped backward from the platform, which was unguarded, and fell upon a pile of wood, from which fall she claims she was injured as stated in her complaint. The platform

was very narrow, being only six feet wide, and the night was dark and rain was falling. The evidence in regard to the lighting is contradictory, that on behalf of plaintiff being that it was exceedingly dark and that there was but a single small lantern, which did not afford sufficient light, and the evidence on the part of defendant being that, while it was dusk, it was not very dark, and that there were two, or perhaps three, lanterns on the platform, which gave sufficient light to have enabled plaintiff properly to have protected herself by the exercise of reasonable care. But the condition of the platform was a matter properly left to the jury and for the purposes of this case must be assumed to have been in the condition related by plaintiff and her witnesses. The testimony was also conflicting as to the extent of plaintiff's injuries, but this also was a matter for the jury and need not be here discussed in detail.

AFFIRMED.

For appellant there was a brief and oral argument by *Mr. John F. Logan.*

For respondent there was a brief and oral arguments by *Mr. Bradley A. Ewers* and *Mr. Louis E. Schmitt.*

McBRIDE, C. J.—1. The main contention in this case inheres in the definition of the word "employment." In other words, when was this plaintiff employed by the defendant? If her employment commenced with receiving the employment card from the employment agency in Portland, or if it commenced when she accepted transportation at Nehalem Junction, then she is subject to the Workmen's Com-

pensation Act and her remedy for her injuries must be found in an application to the Industrial Accident Commission and not by an action for damages against the defendant company.

The theory of the defendant is that either when she accepted the employment ticket from the agency in Portland, or in any event when she accepted transportation over defendant's logging road from Nehalem Junction to the buildings of defendant where she was expected to perform her work, she was an employee of defendant and therefore subject to the terms of the Workmen's Compensation Act. The contention of the plaintiff is that she was not employed by the company until it actually accepted her services, either by word or act. The case of *Suznick* v. *Alger Logging Co.,* 76 Or. 189 (147 Pac. 922, Ann. Cas. 1917C, 700, 9 N. C. C. A. 926, and note), would be decisive of this case and would foreclose in favor of plaintiff's contention the whole controversy on this point were it not for the fact that at the time that case was before this court the statute now existing was not in force and there was no law regulating the transactions between an employment agency and an applicant for work, or between an employment agency and an employer ordering prospective workmen. The statutes hereinafter quoted introduce a new element into the controversy, making an exceedingly plausible argument for the contention of defendant, so that the solution of the question is now fraught with serious difficulties.

Section 6619, Or. L., defines the term "employer" as follows:

"Employer. The term 'employer,' used in this act, shall be taken to mean any person, firm or

corporation, * * that shall contract for and secure the right to direct and control the services of any person, and the term 'workman' shall be taken to mean any person, male or female, who shall engage to furnish his or her services subject to the direction or control of an employer.''

Now the question arises, at what time did the defendant contract for and secure the right to direct and control the services of plaintiff, and at what time did plaintiff engage to furnish her services, subject to the direction or control of defendant? Let us see whether the statutes quoted solve this question as a matter of law. Sections 6730, 6731 and 6732, Or. L., are as follows:

''§ 6730.  Civil Liability of Employment Agent. Any employment agent who sends an applicant for employment to any place within the limits of the State of Oregon on information that is incorrect or not as stated in the receipt for fee paid by the applicant for employment or if the position which the said applicant is to take has already been taken and is not procurable for such applicant, said employment agent shall be liable for the fee paid by the said applicant and the return of the same, and for the return of the fare or transportation to and from the place where the said applicant is sent; provided, however, that if transportation is furnished or offered the applicant by either employer or the employment agent, the said applicant shall recover only his fee, and provided further, that any applicant who obtains employment and is discharged within two days shall be entitled to the return of his entire fee from the employment agent, and if the applicant is discharged after two days and within six days, he shall be entitled to one-half of the fee, except in cases where it is specifically stated on the face of the employment ticket that the employment is for six days or less, and provided further, that the ap-

plicant shall have no right to recover, against either the employer or the employment agent, either the transportation, fees or other costs, in the event that the said applicant voluntarily refuses to go to work in the position stated in the receipt, or is discharged by reason of intoxication or other good and sufficient cause.

"§ 6731. Civil Liability of Employers. Any employer who shall request an employment agent to supply labor, who shall refuse to accept such labor so supplied, or who shall discharge such labor without cause, shall be liable to the said employment agent and to the applicant for damages thereby sustained, and provided further, that the applicant may proceed against either the employer or the employment agent.

"§ 6732. Indorsements of Receipts by Employer. Each receipt for fees given by the employment agent to the applicant shall have printed on the back the following indorsement to be filled out by the employer in the event that the applicant is not given employment, or is discharged within six days:

" 'To the Employer.

" ' (Kindly fill out the blank below and return this receipt to the applicant in case you do not employ him, or if he is discharged for any reason within six days after being employed.)

" 'State clearly whether applicant was discharged or quit position of his own accord, how long applicant worked, and if applicant was discharged or quit; state fully and clearly facts and reasons therefor.' "

Section 6733, Or. L., among other things, contains the following:

"§ 6733. Criminal Liability of Employers, Their Agents, Employment Agents, Their Agents. * * It shall be unlawful for any employment agent to send any applicant for employment on information known to be incorrect or not as stated in the receipt for the

fee paid by such applicant for employment. * * It shall be unlawful for any employer or agent of any employer to order men from any employment agency and to refuse to accept such men so supplied or to discharge such men in less than six days without good and sufficient cause. * * "

2. In the first place, the employer directs the employment agent to supply him with labor. He is not bound to accept the labor so furnished if for good and sufficient cause he sees fit not to do so. In other words, there is no hard-and-fast obligation as between him and the employment agent to accept the labor if it should in fact be unsuitable to his purposes or if for any good reason he sees fit to reject it. His obligation is between himself and the employment agent. Now, let us see what the contract of the employment agent is. It is in writing and therefore its construction is a question of law. The agent does not agree, as will be seen, to furnish employment. His contract with the applicant is to furnish "correct information" by which the applicant shall be entitled to secure a situation, so, up to this point, he is merely selling information, and the transaction is between himself and the applicant. The penalty for his failure to furnish correct information which shall result in the applicant being entitled to secure employment is to make certain restitution provided for in the act, and this restitution is conditioned, first, that the applicant shall apply at the place designated, that he shall apply in person, and to the person to whom he is directed, or his agent, and that he shall fail to get the situation. Up to this point it is clear that there is no contract of hiring. There is a contract between the applicant and the employment agent that the in-

formation that the agent furnishes is correct and such as to enable the applicant to secure the desired situation, or that the money the applicant has paid will be refunded. So there can be no employment by reason of the ticket or receipt given by the employment agent to the applicant.

The next thing upon the program is to fix the liability upon the employer, that is, to make him an employer. First, he must request the employment agent to supply labor, and to render himself liable either to the employment agent or to the applicant who comes with a ticket he must refuse to accept the labor supplied without cause, in which case he will be liable in damages both to the employment agent and to the applicant. Section 6732, Or. L., seems to contemplate that the employment is not completed by the mere giving of a receipt by the employment agency or by the presence of the applicant at the place and time designated in the ticket, because it provides for an indorsement by the employer on the back, to be filled out by the employer in the event that the applicant is not given employment. So we have the applicant, with a receipt from the employment agency, presenting himself to the prospective employer and still not, under the terms of the law, under actual employment.

Section 6733, Or. L., would seem merely to provide certain criminal penalties for the giving of false information by an employment agent or for frivolous refusal on the part of the employer to accept a prospective workman when sent to him. We do not think that the law contemplates that a complete contract of employment should be presumed from the mere fact that the employer had directed

the agent to send him a workman and that a person should be sent by the employment agent. There is still a *locus poenitentiae* on the part of both the person ordering the labor and the person who is sent. It might well be that the plaintiff in this case, or any other person sent to a logging camp, after arriving there and looking the ground over and seeing the surroundings, would decline to engage himself or herself to work; or it might well be that a prospective employer, after seeing and appraising the capabilities of an applicant, would come to the conclusion that such a person was not one he would desire to have in his employ.

It will be noticed that there is no obligation imposed upon the person sent by the employment agency to perform the work, and there is no obligation on the part of the person ordering the workman to accept one so applying if he reasonably deemed it advisable not to do so, whether this obligation was upon physical or moral grounds, or on account of some sudden change in the situation. If his order to the employment agent and the fact that the person presented himself constituted the contract, then the employer might find himself saddled with an inefficient person, or a cripple, or an incompetent, or someone unsuitable for any one of a dozen different reasons. So we conclude that up to the time the applicant reaches the premises and either agrees with the person authorized to hire labor to engage upon the labor for which he has made application to the employment agency, either by going to work or by any other act indicating that he has accepted the situation, and there is some affirmative act on the part of the employer indicating that the ap-

plicant is satisfactory, there is no contract of hiring, and the applicant is not employed. Up to that time the employer is a person seeking for an employee and desirous of employing a suitable person, and the applicant is merely on the premises in search of work.

The fact that plaintiff had an employment ticket and was permitted to ride to the place of employment on defendant's train instead of walking did not make her an employee, and if the train had been wrecked on the way, or if she had suffered an injury while waiting at the station, we have no doubt that the Industrial Accident Commission would have rejected her claim on the ground that she was not in actual employment but was merely on her way to seek employment. We think the instructions of the court upon this point were quite as favorable to the defendant as the law justifies. Taking the facts that nobody disputes and applying the law to these facts, we think the court might well have instructed the jury that, as a matter of law, plaintiff was not in the employment of the defendant at the time of the accident.

It is not competent for the legislature to create a contract in which only one of the parties is bound, and such would be the case if the employer were bound as a matter of contract to accept the services of an applicant under a penalty for refusal to do so, while the applicant, after presenting himself and appraising the situation, was not bound to enter upon the labor. The remedy given an applicant upon a frivolous rejection of his services by the prospective employer does not sound in contract, but is purely statutory, and in tort. It is for damages for friv-

olously refusing to contract after having induced the applicant to expend time and money in coming to his premises for the purpose of entering into his services.

The fact that plaintiff was given a free pass upon the logging road of defendant from Nehalem Junction to its camp and headquarters further back in the timber did not constitute an acceptance of her services. It is evident that this was a method adopted to avoid the consequences and restrictions incident to a common carrier and in respect to applicants for employment it was no doubt more convenient for the defendant to have applicants come to its headquarters than to meet and appraise and bargain with them at the junction, where nobody authorized to make a contract of hiring was located. In this respect plaintiff was in the position of an invitee, and entitled to the care due to that relation. The legal status of the parties at the time of the accident, as we derive it from the terms of the employment slip, the pass over the defendant's road, and the testimony of defendant's witnesses was briefly this: The defendant said to the plaintiff, "I want a competent and suitable waitress. Come to my place of business, and if you are competent and suitable I will hire you at a certain wage." The plaintiff went on this invitation and with the legal right to refuse to take the position if for any reason it was not satisfactory to her. The mere fact that she spent the night beneath defendant's roof, or stepped upon defendant's platform, did not, of itself, constitute an acceptance of defendant's offer. Such was the construction placed at the time by defendant's officers upon the status of the parties. Plain-

tiff came to Nehalem Junction and subsequently to the camp on December 30, 1922. If defendant considered her then in its employ her wages would have been computed from that date, but, as the checks given her show, her wages were computed and paid from January 1, 1923. This, while not conclusive, tends to show the construction put upon the contract of hiring by the parties at the time. Yet one may be under such a contract with another as to be a present employee, although the actual work incident to the employment may not be begun until a future day. But we are not dealing now with the question as to when plaintiff actually began work, but with the more important question as to when she entered into such a contract to work as subjected her, *eo instanti,* to the orders of the defendant.

Judge STAPLETON, who tried the case below, in a charge which vindicates his well-earned reputation as a careful and profound jurist, drew a distinction between those cases wherein an employment agent, having reason to believe that employment *might* be secured at a particular place, without orders from the possible or probable employer, sent an applicant to that place to seek employment, and another case wherein the employer had expressly authorized the employment agent to send him a person for a particular job, holding, substantially, that in the latter instance the contract of hiring became complete when the applicant appeared at the place designated (in the present instance Goble, or Nehalem Junction, which is practically the same place), and accepted a pass to the camp and boarded defendant's locomotive for the camp. The testimony here does not indicate an authorization to the employment agency to make an absolute contract of hiring. The

only testimony on this subject was given by defend-
ant's superintendent and is as follows:

"Q. Now did you have occasion during December,
1922, to have the crew at the camp lay off before
Christmas? A. Yes, they did.

"Q. Now, did the crew come back after Christmas?
A. Yes.

"Q. Just tell the jury how you arranged to bring
them back. A. Before Christmas the foreman, Mr.
Kramer, and myself arranged with Mr. Tanney for
such men as we wanted.

"Q. Who is he? A. He is in chage of the employ-
ment bureau where we got our men. In order to
avoid a lot of confusion as to just which ones of
the old people we wanted and which new ones he
would get together, we have our arrangement with
him. It is always customary to get the cook-house
crew in advance of the main crew and in this case
there were three waitresses who it seems had been
waitresses of good standing, so I instructed Mr.
Tanney to have the three of them back, that is,
before Christmas, and for some reason or other the
third one was taken sick, anyway I told him that I
knew she wasn't feeling well, in case she didn't
show up for him to get another waitress, and then
I arranged a meeting with Mrs. Bertrand and in-
structed her—that was in the Imperial Hotel lobby—
and instructed her to bring the second cook.

"Q. Did you give her any instructions to bring
anybody else? A. No, sir.

"Q. Whom did you mean by the second cook?
A. The assistant to the head cook.

"Q. Who turned out to be the second cook in this
case? A. Mrs. Scarborough.

"Q. Do you know what happened after that?
A. Then we arranged to have the cook-house help
come in on Saturday, December 30th, and they
left Portland on the train that leaves about 1 o'clock,
or 1:10. Now one of the girls was living at St.

Helens, the other one's people live in Skomockowa, and the third one was to come from Portland.

"Q. Was she to have an employment ticket? A. Yes, from the employment agent."

This testimony is vague in the extreme as to any special authorization delegated to the employment agency absolutely to *hire* a waitress. "We arranged with Mr. Tanney for such men as we wanted," is far short of a declaration that the employment agent had authority absolutely to hire them. Plaintiff was to "have a ticket from the employment agent." This would seem to refer to the ticket specified in the statute, which is not a contract for employment. These instructions, meager as they are, were not communicated by the agent to the plaintiff, and it can hardly be held that she entered into a contract to hire her services absolutely to the defendant without being aware of the fact. Her dealings with the agent are in writing in the form of the receipt, or employment ticket, and, as already shown, this writing did not make her an employee of the defendant. Added to this is the circumstance that the agent was not called to corroborate this account of the alleged instructions given by the superintendent to the employment agent. There was ample room for the action of the court in submitting the matter to the jury, which it did.

Perhaps it was an afterthought, but there is at least plausible ground for the statement of plaintiff that she did not make her application to the Industrial Accident Commission because she did not think she had been hired when the accident happened. Such an application would have been a serious step. If she had assumed that she was an employee and had made such an application and

had been rejected on the ground that she was not yet technically employed, the fact of having made such an application would have seriously embarrassed her in a subsequent action against the company. We conclude from all the testimony on that subject that there is no evidence here of a contract of employment at the time of plaintiff's injury, and that she was not at that time subject to the Workmen's Compensation Act.

This being the case, her position was that of an invitee to whom the company, under the circumstances, owed the simple duty of using reasonable care to protect her from injury. This subject is adequately treated in *Sweeny* v. *Old Colony & Newport R. R. Co.*, 10 Allen, 368 (87 Am. Dec. 664); *Glaser* v. *Rothschild*, 221 Mo. 180 (120 S. W. 1, 17 Ann. Cas. 576, 22 L. R. A. (N. S.) 1045); *Southern Ry. in Kentucky* v. *Goddard*, 121 Ky. 567 (89 S. W. 675, 12 Ann. Cas. 116). The copious notes to these cases in the reproductions above cited seem to cover all phases of the contention here.

3. Numerous authorities are cited by appellant to the effect that an employee going to or returning from his work or going to the place where he is employed to perform labor is "acting in the course of his employment," and is subject to the provisions of the Workmen's Compensation Act. This is sound law. But before it can be applied there must exist a complete contract of employment. That is, the person sued as an employer must have bound himself unreservedly, either by word or act, to accept and pay for the services of the applicant, and the applicant must have bound himself unreservedly, by word or act, to perform the required labor. As before remarked, the plaintiff did not, by accepting

the employment slip from the agency in Portland, or by accepting the free pass over defendant's railroad from Nehalem Junction to the logging camp, enter into a contract to serve defendant as a waitress. The expedition so far was tentative and depended upon the further contingency that upon her arrival at the scene of the proposed labor she should appear satisfactory to the defendant, and that the conditions and surroundings under which the proposed labor should be performed should be satisfactory to her. It does not anywhere appear that the switchman at the junction had any authority to hire anybody. At the most, his authority consisted of the right to demand an inspection of the employment slips furnished to applicants for labor and to furnish transportation to those having such slips and to deny transportation to persons not having slips or not known to be present employees of the defendant. The fact that upon the direction of the superintendent or some other person she stepped backward on the platform to make room for other persons alighting from the cab did not render her an employee of defendant any more than a person traveling on the Southern Pacific Railroad and stepping out of the way of descending passengers at the command or request of the station agent thereby enters into a contract of employment with the railroad company. The command, or request, or suggestion to stand back was such as could reasonably be made to any passenger on the cab, whether in the employ of the company or not, and compliance with it did not indicate, either as a matter of law or fact, that plaintiff considered herself thereby a servant of the defendant. The position of plaintiff was clearly

114 Or.—21

that of an invitee of the defendant, and the defendant owed to her the duty of exercising such reasonable care as the time, place and circumstances would justify to protect her from being injured by dangers unknown to her and which the exercise of reasonable diligence on her part would not have disclosed. This was a question for the jury and the court very properly left it with them by an appropriate instruction.

4, 5. It appears from the evidence that plaintiff failed to disclose to defendant's agents the full extent of her injuries, or to demand the free hospital treatment which she was entitled to under her contract as an employee. In so far as this delay or omission tended to the aggravation of her injury she was not entitled to recover, and the court so stated to the jury. There was also testimony from experts eminent in the profession of surgery that an operation or operations would most probably obviate the injuries which plaintiff had sustained, and some evidence that after the institution of this action defendant had offered to pay the expense of such an operation. A number of instructions were asked upon this branch of the case. In fact, the requests of defendant upon this phase of the case were presented in so many different forms as to give great, and we think undue, prominence to this part of the testimony. Instructions as to the particular course which an injured person must take in minimizing an injury of the character suffered by plaintiff involve extreme difficulty. While not undervaluing the opinion of learned surgeons, it is a matter of common knowledge that large incisions into the walls of the abdomen and the cutting and trimming of them to produce the required approximation are

operations attended with more or less danger to the
person operated upon, and an injured person is not
required to make any considerable risk of life with
a view to being ultimately and perfectly restored.
That every remedy reasonably safe should be re-
sorted to goes without saying, but instructions in
this respect should be cautiously qualified.  We are
of the opinion that the instructions upon this subject
given by the learned court embrace everything that
defendant had a right to ask.  They are as follows:

"While the contract, or the certificate, provides for
hospital charges and so forth, and the evidence dis-
closes that hospital dues were charged, in so far
as the general result is concerned, if you find she
was under the Workmen's Compensation Act, why,
that wouldn't make any difference if she had.  I
instruct you as a matter of law under the terms
of this she had a right to hospital service; it was
for her, she was entitled to it, even to the point of
employing a surgeon to take care of her injury, and
it is only in the case, if you find her contention in
the case, that you would be required to go into
that.  If you should find the first contention to exist,
that she was entitled to it and that they were
negligent and she was entitled to damages therefor
because of their negligence, because if the relation
of employer and employee did not exist, then you
can go into that.  Damage in this case is based
solely upon the idea of compensation, not punishment
or anything of that nature, but to compensate the
party for the loss sustained; and then you have a
right to take into consideration this question of
hospital service, because, as you have heard discussed
here several times by counsel, I would instruct you
that, and I have repeated it several times, when a
person is injured through the carelessness or neg-
ligence of another it becomes the duty of that person
to exercise due diligence and care, reasonable care,
in selecting medical attention, selecting a physician

or doctor to take care of her, and to exercise due care to see that the injury is taken care of to the end that the injury may be kept down—minimized is the way to put it—as much as possible. The law does not encourage your neglecting to follow up an injury and apply proper cures and proper attention to it for the mere purpose of exaggerating your injury or increasing the possible claim for loss. It requires you, as soon as you are injured, to remedy the condition so as to keep down the cost and expense or the damage that might be claimed from the injury; and that would apply in this case, that as soon as the plaintiff was injured the law would exact of her the exercise of that degree of care which was proper to go to the employer for surgical assistance and medical attention and to take proper care of herself to reduce and minimize the result of the injury as the result of negligence, if negligence was there; and if she failed to do that, then exaggeration of the injury may have occurred after that time, and if she had the opportunity to prevent it, it could not be made the basis of increasing an exaggerated claim against the defendant.''

6. It was evidently the object of the court to boil down and summarize in a few brief sentences the substance of most of the numerous instructions requested by defendant on this subject, and to give them in a form which the lay mind could digest. The defendant saved a general exception to *all* the requests not given. Some of these were misleading and beyond the law, and such an exception did not apprise the court as to the particular point which defendant had in mind, or as to which of these requested instructions counsel believed not sufficiently covered in the general charge. Theoretically, the jury is supposed to learn in the course of a half an hour's deliverance from the bench all the law on a particular subject, which it has taken years

of study by court and counsel to understand.   Under such circumstances, the court should always confine its instructions to simple, general principles, without going too minutely into details whose tendency would be to confuse and mislead.   This we think the court did sufficiently to enable defendant to have a fair presentation of its case.

7. Considering some of these requested instructions in detail we find them beyond the law.   One requested is as follows:

"You are instructed that no matter what a member of the jury may believe in his or her private capacity as to the efficacy of medicine or surgery, if the evidence in this case shows that a surgical operation would have relieved or will now relieve the plaintiff from any hernia, it was the duty of plaintiff to adopt such a course if reasonably possible."

We think it would have been entirely competent, in view of the defenses suggested in the answer, for defendant to have questioned the jurors upon their *voir dire* upon their beliefs as to the efficacy of medicine or surgery in a case of this character and as to how far a disbelief in that respect would affect them in a case in which failure to resort to a timely use of such agencies was pleaded as a defense.   But the request went beyond this.   It suggested a case in which relief from hernia by surgery seemed "reasonably possible."   In other words, if it seemed reasonably possible that plaintiff would survive the operation, the implication is that she should have taken the chance.   Plaintiff, and many other people, would prefer, in cases where their insides were involved, to give themselves the benefit of the doubt and "Rather endure the ills they have than fly to others they know not of."

8. Another requested instruction excepted to is as follows:

"The fact that plaintiff may have feared the effects of an operation for the reduction of the hernia or hernias, if you find that she was so suffering, would not justify her refusal to submit herself to an operation if you find that such an operation was offered to her or was within her means and at the same time hold the defendant for damages for any pain or suffering after such refusal."

This request is also vulnerable to the same objection. It wholly leaves out the element of risk on the part of the plaintiff. So far as it is at all applicable it is covered by the general charge.

9. Another requested instruction is as follows:

"You are instructed that an injury that heals within a reasonable time or is subject to removal by an operation according to approved medical methods is not a permanent injury and a plaintiff so situated cannot recover for permanent injuries."

There was no evidence that the injury would heal within a reasonable time, or at all, without a surgical operation, and as to that the requested instruction leaves out the element of risk. The writer can never assent to the doctrine that an injured person is legally bound to submit to a major operation in order to minimize an injury. The contrary is the case where the risk is small and favorable results reasonably probable.

10, 11. Error is also predicated upon the failure of the court to give an instruction deprecating a quotient verdict. Such an instruction belongs to that class designated as "cautionary" instructions, which are usually held to be within the discretion of the court to give or refuse. It is not usual for the

court to select a particular species of misconduct in the jury-room and warn the jury against committing it. It is safer in this respect for the court to confine itself to those matters of misconduct prohibited by substantive law, such as separating from each other, conversing with outsiders about the case, drinking intoxicating liquors, and the like, all of which are indicated in the directions to the bailiff, than to select some particular item of misconduct and caution the jury against that particular act or method. We are cited to no case where the refusal to give such an instruction has been held error. Indeed, we have no knowledge of any instance in which it has been asked. It is true that it is usually a difficult matter in a case of a quotient verdict to make the fact that the decision has been so arrived at appear to the court. On the other hand, the difficulty which always arises in the jury-room, of inducing twelve jurors unanimously to appraise pain, incapacity for work, mental anguish, and the like, at exactly the same amount would be insuperable if there were no interchange of opinion and mutual concessions. Accordingly, it has been held that it is not necessarily fatal to a verdict that it was arrived at by striking an average of the estimates of each individual, if they have not bound themselves to abide by such a result beforehand. If it is only a tentative experiment adopted to get at the sentiments of each individual as a part of the discussion as to the amount of damages, the verdict is not bad because on further discussion the jurors conclude that such average represents a fair compensation and renders a verdict accordingly. While the proposed instruction does not include such a state of facts, this and like hypothetical situations illustrate the difficulties that may

arise, and account for the indisposition of the courts to attempt to lay down any hard-and-fast rule by way of instructions as to the methods to be employed by the jury in its discussions. Many things in our jury system may be subject to abuse, but there is generally some extraordinary element intervening before the court leaves the issues made by the pleadings or evidence to give cautionary instructions.

Taken as a whole, the record indicates that an exceedingly fair trial was had in this case. And while, as the judge below remarked, some of the questions presented are perplexing and their solution difficult, we find nothing in the record which would justify us in reversing the judgment, and it is therefore affirmed.        AFFIRMED.

BEAN, BROWN and BELT, JJ., concur..