### NORTHERN RAILWAY COMPANY *v.* PAGE et al., ADMINISTRATORS.

#### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 136.   Argued January 17, 1927.—Decided April 11, 1927.

Costa Rican troops on a railway train fired into a train of the defendant and shot the plaintiff, a passenger.   The negligence alleged was that defendant knew the troops had reasonable cause to believe the passenger train was transporting armed hostile forces and failed

seasonably and adequately to inform the government troops that this was not so. *Held,*

1. Plaintiff had the burden to show that the specified negligence was the proximate cause of his injuries, and a verdict in his favor can not be sustained if essential facts are left to conjecture and speculation. P. 72.

2. There being no evidence that the conductor did not notify those in charge of the troops that there were no hostile forces on the passenger train, his failure to testify on that point does not permit an inference that he was not in position so to state. P. 73.

3. The mere fact of the shooting does not tend to show defendant was at fault; the uncontradicted evidence shows that the shooting could not reasonably have been anticipated as the natural and probable result of the failure of defendant to inform the government forces, earlier or otherwise than was done, that there were no insurrectos on the train. P. 75.

3 F. (2d) 747, reversed.

CERTIORARI (269 U. S. 542) to a judgment of the Circuit Court of Appeals which reversed a judgment of the District Court, entered on an alternative verdict for defendant, and directed the District Court to enter judgment on the verdict of damages for the plaintiff, in an action for personal injuries suffered by the plaintiff while a passenger on defendant's railway in Costa Rica, when the train was fired upon by Costa Rican troops.

*Mr. Robert G. Dodge,* with whom *Mr. John M. Raymond* was on the brief, for petitioner.

*Mr. Charles F. Perkins,* with whom *Mr. Paul F. Perkins* was on the brief, for respondents.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This action was brought in the District Court of Massachusetts by Michael B. Ryan against the petitioner and the United Fruit Company to recover damages for personal injuries sustained by him, February 23, 1918, in Costa Rica while a passenger on a railway train alleged to have been operated by both companies. A verdict was directed for the Fruit Company. No question as to its

liability. is presented here. We may refer to the railway company as the defendant.

On the day before plaintiff was hurt a small insurrection broke out in a part of Costa Rica west of San José, the capital. Plaintiff was traveling on the regular morning passenger train running easterly from that city to Port Limon on the Atlantic coast. At Turrialba, about 65 miles from Port Limon, the train was held up by insurrectos. Its seizure was reported to the Governor at Port Limon, and he sent out a train containing government troops. After detention for some hours the passenger train was allowed to go. The railroad is a single track line having sidings at various places. Both trains were given orders to meet at La Pascua. The passenger train was the first to arrive at that place and went upon the side track to let the troop train pass. The officers of the troop train gave an order to, and the troops did, fire upon the passenger cars. Some passengers were killed and others, including the plaintiff, were seriously injured.

At the close of the evidence, the district judge, doubting whether there was anything to show negligence on the part of the defendant, submitted the case to the jury; and, in accordance with the practice in Massachusetts and that federal district, directed the jury that, if they found for the plaintiff, they should also return an alternative verdict for defendant, which could be entered if later it should be held as a matter of law that plaintiff was not entitled to recover. General Laws of Massachusetts, c. 231, § 120; *Automatic Pencil Sharpener Co.* v. *Boston Pencil Pointer Co.,* 279 Fed. 40. The jury gave plaintiff a verdict for $25,000 and made the alternative finding as directed. Afterwards, on motion of the defendant, the district judge set aside the verdict for plaintiff and entered the alternative verdict. He held that there was no evidence to support a finding against defendant. Subsequently, plaintiff died; his administrators were made parties, and judgment

was entered for defendant. The case was taken to the Circuit Court of Appeals, and that court vacated the judgment of the District Court, set aside the verdict for defendant, and remanded the case with directions to reinstate the verdict and give judgment for plaintiffs. 3 F. (2d) 747. This Court granted defendant's petition for a writ of certiorari. 269 U. S. 542.

At the trial plaintiff called a witness familiar with Costa Rica law. He testified in substance: One who through his fault causes injury to another is bound to make reparation. If a corporation is to be held, the negligence must be that of a person who stands in position of representative. One in immediate charge of a train is held to be the representative of the railroad company for the purpose of that operation. The rule that a high degree of care is owed by a railroad carrier to its passengers does not prevail in that country. The duty owed is uniform. It is the care exercised by a diligent head of a family—a prudent and diligent person who is his own master. In the absence of negligence on the part of the carrier, it is not liable for injuries sustained by passengers. The witness cited §§ 1045 and 1048 of the Code of Costa Rica. Plaintiff sought recovery on the ground that defendant knew that the troops had reasonable cause to believe that the passenger train was transporting armed hostile forces and failed seasonably and adequately to inform the government troops and their officers that there were no insurrectos on the passenger train.

There is little or no controversy as to the facts. The passenger train left San José at eight in the morning and was due at Port Limon at 4.30 in the afternoon. It consisted of locomotive, five freight cars, a combination baggage and second-class passenger car; one or two first-class coaches, and a pay car carrying gold, silver and express parcels. Ramsay was the conductor; he and other members of the crew were regular employees of defendant.

The passengers were men, women and children—some natives and some foreigners. The train arrived at Turrialba at half after eleven. There the insurrectos held it up and searched for persons connected with the Government. One was taken on suspicion, but no one else was molested. The officers in command gave assurance that the train would be detained only while the insurrectos used the engine to destroy track between that place and San José. About a quarter before six, the train was allowed to go. As it was leaving, an officer ordered some insurrectos to go and blow up the bridge at Torito, which is about two miles east of Turrialba. When the train arrived at Torito, all the insurrectos got off. The train went to Peralta, four or five miles further on, where the conductor received an order to pass a special train at La Pascua, which was five or six miles ahead. No information was given him that this was the train carrying troops. That train left Port Limon about half after three. It was also in charge of regular employees of the defendant. The train crew and the officers in command of the troops knew that the passenger train had been held up by the insurrectos. The troops were ordered to Turrialba to meet the rebels. At Las Lomas orders were received to pass an extra or special train at La Pascua, about six miles west. The troop train arrived at La Pascua about seven o'clock.

We quote from the record:

"Grant, a witness called for the plaintiff, testified on direct examination as follows: 'When the cars came close enough you could see guns sticking out of the windows in perfect alignment, and see troops standing on the steps, . . . I believe somebody on the ground, Mr. Ramsay or Mr. Veitch or somebody else there, mentioned that it was a troop train going up to attack these revolutionists.' When the locomotive of the troop train arrived opposite the combination baggage and pas-

senger car, Ramsay flagged it and told the engineer to
look out for the Torito bridge where he had left revolu-
tionists, that he would probably find it torn up.  Two
officers then alighted from the troop train and one said
to Ramsay 'What train is this?' . . . he replied that
it was the regular passenger train from San José to
Limon.  He told the officer in English and then in Span-
ish that there were no revolutionists on board.  Ramsay
testified that he knew the officer by sight as he had trav-
eled on his train before.  At the same time the other
officer was speaking to one Veitch . . . He asked
Veitch what the train was, and Veitch replied that it
was the passenger train from San José to Limon, and
that there were no revolutionists on board.  Veitch had
been an importer and banana grower in Costa Rica for
eleven years prior to 1918, and was then consular agent
for the Italian Government.  Ramsay then signaled his
train to proceed, the officers demanded that it be halted,
which was done.  The troop train then began to move
forward, the officers walking beside it.  When the pas-
senger cars of the troop train were approximately oppo-
site the passenger coaches of the passenger train, and
while the troop train was still in motion, although com-
ing to a stop, one of the officers raised his sword and
waved it and an order to fire was given.  Immediately
the firing began by the troops, some kneeling in the car
with their guns extending out of the windows about three
feet, and some on the platforms."

The record contains nothing that in any material or
substantial particular conflicts with that account of what
there occurred.  In fact, it is supported by the testi-
mony given by plaintiff in his own behalf.  He said: The
passenger train went upon the siding at La Pascua and
was there five or ten minutes before the troop train
arrived.  He remained in the coach.  Some of the passen-
gers got off the train and walked about.  When the troop

train first stopped the engines were about opposite each other. He saw Conductor Ramsay and the officers in command of the troops talking, but did not hear what they said. There was nothing to indicate that any one was alarmed or expected trouble. The troop train pulled up and stopped so that a troop car was opposite plaintiff's car. The weather was warm and the windows of the passenger cars were open. There was nothing to indicate that it was other than an ordinary passenger train. There had been no sign of hostility. The troops, lined up in their car, fired into the windows of the passenger cars. There were about twenty passengers in plaintiff's car; some were in the aisle and some were looking out the windows. And plaintiff testified that it was light enough so that one could see a considerable distance; that, when the troop train first stopped, he could see Conductor Ramsay apparently talking to the officers in charge of the troops, "That would be probably 100, 150 maybe 200 feet. I don't remember. It was the full length of the train. We were pretty nearly back." He said that it was light enough for him to see Ramsay and the officers at that distance; and, although it was dusk at the time, there was good visibility up to 200 feet.

Veitch, called as a witness for defendant, testified that, when the troop train stopped and while Ramsay was talking to one of the officers, he talked to the other officer and told him that it was a passenger train from San José to Port Limon and that there were no revolutionists on board. Later he heard this officer give command to the troops to fire, and firing began immediately. He stood there until he saw guns pointed at him and then went under the train; they put two bullets through his clothes and two through a valise he was carrying; and he saw them shoot and kill a man who was leaning out of a coach window.

On the day of the shooting, the general manager of the company was at its offices at Port Limon. He testi-

fied that, when he learned that the insurrectos had held up the train, he notified the Governor who was also at Port Limon; and that, when he learned the insurrectos were ready to release the train, he so informed the Governor and the latter instructed him to move the passenger train; that he reminded the Governor that there was a troop train on the line. " I told him he had better notify the troop train. He said he would. Afterwards he said he did." And the general manager testified that he promptly telephoned to the yard master at Siquirres, a station east of Las Lomas, to get word to the conductor of the troop train that the passenger train was carrying non-combatants, including women and children. The railway superintendent testified that he notified the Governor of the release of the passenger train and asked and procured authority to move it to Port Limon. The assistant train dispatcher, who came on duty at five o'clock, testified that about a quarter after five Ramsay reported that the train had been released, and later reported from Peralta that all of the revolutionists had got off at Torito to destroy a bridge; that, when the troop train was at Siquirres, he notified the conductor that the passenger train had been released and that " meet orders " would be given later; that he communicated with the troop train at Las Lomas that the other train had no revolutionists aboard and gave orders to pass it at La Pascua.

The burden was on plaintiff to show that defendant's negligence, as specified above, was the proximate cause of his injuries. Under familiar rules, plaintiff was entitled to prevail if the evidence and the inferences that a jury might legitimately draw from it were fairly and reasonably sufficient to warrant a finding in his favor. Otherwise the judgment must be for defendant. *C. M. & St. P. Ry.* v. *Coogan,* 271 U. S. 472, 478, and cases cited. The verdict cannot be sustained if essential facts

are left in the realm of conjecture and speculation. *St. Louis, etc. Ry.* v. *Mills,* 271 U. S. 344, 347.

The record does not include or purport to contain all the evidence. It does not show that Ramsay failed to testify as to what he said to the officers in command of the troops before the order to fire was given. It shows that he testified that when the shooting began he called out to the troops that they were firing on passengers and that there were no revolutionists on the train. And, in the paragraph quoted, the bill of exceptions shows that plaintiff's witness, Grant, testified that when Ramsay flagged the troop train, he told one of the officers that his was the regular passenger train and that there were no revolutionists on board. In the opinion of the majority of the Circuit Court of Appeals it is said (p. 752): " The jury might have found that, inasmuch as Ramsay, the conductor, did not testify as to what he said to the officers in charge of the troops prior to the shooting, but did testify that when the shooting began he cried out that there were no revolutionists on the train, nothing of the kind was said until after the shooting began; that the troops and their officers never received any information as to the harmless character of the occupants of the train, or received it too late and under such circumstances as to render it unavailable."

· This view cannot be sustained. There was no basis for the court's assumption. There was nothing reasonably to warrant the rejection of Grant's testimony. Indeed, plaintiff's own testimony tended to corroborate Grant. And the district judge in charging the jury assumed as an undisputed fact that when the train stopped the officers were informed by Ramsay and Veitch that there were no revolutionists on the train. The case having been so put to the jury, it is to be assumed that they considered the matter on that basis. Defendant was not required

to satisfy the jury that it was not guilty of the negligence alleged against it. If Ramsay had not testified at all, his failure so to do could not be taken as substantive evidence of any fact. If, instead of showing that Ramsay had told the officers that no insurrectos were on his train, plaintiff had put in testimony that no such information had been given to the government forces and then Ramsay had remained silent, it would have been permissible to draw an inference that he was not in position to assert the contrary. But that is not the situation here presented. *Tully* v. *Fitchburg Railroad,* 134 Mass. 499, 502; *Poirier* v. *Terceiro,* 224 Mass. 435, 437; *W. F. Corbin & Co.* v. *United States,* 181 Fed. 296, 304; *Owens Bottle-Machine Co.* v. *Kanawha Banking & Trust Co.,* 259 Fed. 838, 842. There is nothing to support a finding that the officers in charge of the troops were not informed at La Pascua before the order to fire was given that there were no insurrectos on the passenger train. The record discloses no reason for rejecting the testimony of Grant and Veitch. It is to be taken as established that such information was given.

And, assuming that a jury properly might decline to believe the testimony of defendant's officials going to show that the troop train and officers in charge had been so informed before they left Las Lomas, actionable negligence was not made out. There was no evidence that the officers in charge of the troops had any reason to believe that the train they were directed to meet at La Pascua was then carrying insurrectos. Even if there was evidence that they had ground for such belief and that defendant failed to take some precaution, there is nothing to show that such failure caused plaintiff's injuries. If the direct and positive information as to the harmless character of the train given on the spot by Ramsay and Veitch was not

sufficient, it must be deemed a matter of speculation and conjecture whether any information that defendant could have given would have prevented the shooting. *St. Louis, etc. Ry.* v. *Mills, supra,* 347. The mere fact that the troops shot into the passenger train does not tend to show that defendant was at fault. And, when regard is had to the facts and circumstances shown by uncontradicted evidence, it is clear that the shooting was an occurrence that could not reasonably have been anticipated or foreseen as the natural and probable result of any failure of defendant earlier or otherwise to inform the government forces that there were no insurrectos on the passenger train. It follows that there is no ground on which defendant can be held liable for the injuries inflicted on plaintiff by the government forces. *Scheffer* v. *Railroad Co.,* 105 U. S. 249, 252; *Milwaukee, etc. Railway Co.* v. *Kellogg,* 94 U. S. 469, 475; *American Bridge Co.* v. *Seeds,* 144 Fed. 605, 609; *Jarnagin* v. *Travelers Protective Ass'n.,* 133 Fed. 892, 896; *Cole* v. *German Savings and Loan Soc.,* 124 Fed. 113.

In his memorandum on the motion to set aside the verdict, the trial judge said: " I am unable to discover in the evidence anything on which a finding of negligence can be supported or to say, even after the event, in what the defendant's agents and servants failed. The jury might, of course, reject the testimony of the defendant's witnesses; but that would not supply evidence of negligence on the defendant's part. The attack took place, apparently, because the officers in command of the troops lost their heads and behaved with incredible folly. It was an extraordinary occurrence which the defendant had no reason to anticipate and for which it is not liable." The record fully sustains that statement.

*Judgment reversed.*