[Civ. No. 5411. Third Appellate District.—November 18, 1935.]

ALLIE E. KARBERG, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

George R. Freeman and Tebbe & Tebbe for Appellant.

Clifton Hildebrand, Allen & McNamara, Louis E. Goodman and Louis H. Brownstone for Respondent.

PLUMMER, J.—This action was and is based upon the provisions of the Federal Employers Liability Act and the Safety Appliance Act, wherein an injured employee is permitted to seek damages sustained by him when in the employ of a railroad company engaged in interstate commerce.

The plaintiff, while employed by the defendant as a brakeman, sustained injuries on the eleventh day of January, 1934,

and upon the trial of the action was awarded a judgment in the sum of $42,500. From this judgment the defendant appeals.

The plaintiff's complaint alleges that his injury was sustained by reason of a defective and inefficient hand-brake maintained in violation of sections 11 and 51 of title 45, U. S. C. A. At the time of the injury sustained by the plaintiff he was of the age of 43 years and in good health. The plaintiff had been working as a railroad brakeman and conductor since 1911, and had been working for the defendant since some time in 1913. In good times he earned as high as $300 per month, and at the time of the injury was earning $173 per month.

At the time of the injury the plaintiff was acting as a rear brakeman on the freight train. At approximately 5 P. M. on the eleventh day of January, 1934, the crew was engaged in switching operations at a station called "Weed". As a part of these operations it was necessary to move four cars standing on track known as "Dock No. 1". This track was within a shed, which was lighted by flood lamps. It was the duty of the plaintiff as rear brakeman to release the hand-brakes on the four cars to be moved. These brakes had been previously set. The track in question was running approximately north and south, with the entrance toward the south. The engine had been backed almost to the four standing cars, and in accordance with his duties the plaintiff released the brakes on the first two cars. Immediately north of these two cars stood S. P. Car No. 35783, the car on which the plaintiff was injured. After releasing the hand-brakes on the first two cars the plaintiff walked across the roof of the second car until he arrived at the northerly end thereof. The brake on Car No. 35783 was on the southerly end of that car. The plaintiff looked at the brake, observed it was set, and thereupon he stepped over to the running-board of Car S. P. No. 35783, laid his brake-club on the roof of that car, and proceeded to climb down the end ladder attached to the end of Car S. P. No. 35783, in order to get over to the brake platform. When opposite the brake platform the plaintiff let go of the grabiron with his right hand and reached over and took hold of the brake-wheel on the lower left end side of the wheel. (The appellant raised some question as to whether the plaintiff took hold of the wheel with his left

hand, instead of his right hand, but as we read the transcript we are satisfied that the plaintiff took hold of the brake-wheel with his right hand.) The taking hold of the brake-wheel with his right hand on the left-hand side of the brake shaft appears to be in accordance with the custom and practice of safety. The brake revolves in a counter clockwise direction. Pressure applied in that direction would, in the case of an efficient hand-brake, tend to keep the dog or pawl engaged in the ratchet, and prevent the brake from releasing.

After placing his right foot on the brake platform, the plaintiff observed that the pawl was engaged in the ratchet. After noticing that the brake was set solid and tight, that the pawl was engaged in the ratchet, the plaintiff proceeded to climb to the platform, still pulling against the brake counter clockwise. He then reached over with his left hand to get hold of the brake-club, and just as he got hold of the brake-club, he glanced down to see where he was going to step. Both feet were still on the left side of the brake platform, and it was necessary for him to place his right foot on the right side of the brake platform in order to release the brake. As he looked down to see where he was going to step, he observed the dog or pawl kick up, and to use his own language, "override the ratchet". The brake so released spun in a counter clockwise direction, plaintiff still having his hand on the brake-wheel. The spinning thereof threw him off the car.

The plaintiff's testimony is that the last he remembered was when he was flying through the air; he did not know where he fell; and the next thing he remembered was seeing his wife by his bed at the hospital at Weed three days after the injury.

There is no question in the testimony that as a result of the plaintiff's fall he received what is commonly known as a fractured skull, accompanied by concussion of the brain; that his injuries were severe; and that he has been totally disabled. The only serious dispute in the medical testimony is as to whether the plaintiff should have submitted to an exploratory operation in the hope that it would clear up his condition. This exploratory operation, however, held to a considerable degree the possibility of a fatal result. From the time of the injury until the date of the trial the plaintiff was practically confined to his bed, and remained in the hospital

until the date of the trial. He was allowed, and was able to leave his bed only for short intervals.

The hand-brake assembly on S. P. Car No. 35783 is located on the end of the car, consisting of a brake-shaft which extends from the top of the car to the bottom. The brake-wheel is fastened horizontally to the top of the brake-shaft. The brake platform is a wooden structure approximately 28 inches long by 9 inches wide, and 1½ inches thick, attached to the end of the car about 3 feet below the roof. A metal pawl-plate is fastened to the top of the brake platform. The brake-shaft passes through one end of the pawl-plate and the ratchet wheel is fastened to the brake-shaft just above the plate. The pawl or dog, as it is commonly called, is on one end of the pawl-plate, and is encased in a housing which is integral with the pawl-plate. A three-fourths inch bolt extending from the top of the pawl-plate through the brake-step passes through the center of the pawl and holds it in place. The ratchet-wheel and the pawl, appellant states, are both one inch in thickness. As we measure the exemplar introduced in court, the thickness of the ratchet-wheel and the pawl we find to be seven-eighths of an inch. The pawl and ratchet-wheel are on the same horizontal plane on top of the pawl-plate. The pawl curves on the end, next to the ratchet-wheel, and is so arranged that when setting a brake, it has to be inserted in one of the cogs of the ratchet-wheel, and if the pawl and ratchet-wheel are both working efficiently, the pawl cannot be removed from the ratchet-wheel after being engaged until the pressure between the pawl and the ratchet-wheel has been released by the brakeman operating the brake by means of the brake-wheel to which we have herein referred.

In setting the brake, the brakeman stands on the brake platform facing the car, places his right hand on one side of the wheel, and uses a brake-club about 32 inches long, with his left hand, in order to give additional pressure in setting the brakes. The brake-wheel is turned in a clockwise direction by pulling on the brake-wheel with the right hand, and pushing on the brake-club with his left. The pawl is then kicked into the ratchet-wheel with the left foot. In releasing the brake a sufficient force must be applied to enable the brakeman to kick the pawl out of the ratchet-wheel. This is done with the left foot, and then the wheel spins

counter clockwise. The pawl does not operate automatically in either setting or releasing the hand-brake.

Upon the trial of the action the appellant introduced in evidence an exemplar of the brake assembly, being, as it is claimed, an exact replica of the brake assembly involved in this action. We may here state that the record shows "Exhibit G" was taken to the jury room for examination by the jury, and our examination of the exemplar or exhibit has been requested by the appellant in this action, and we have complied with that request. This examination shows, as we have stated, that the ratchet-wheel and pawl are seven-eighths of an inch in thickness; that the end of the pawl which engages in the ratchet-wheel is blunt or rounded; that the play of the pawl is such that by laying the weight of one's hand on what we will call the "lever" end of the pawl, the end of the pawl designed to engage in the cogs in the ratchet-wheel is lifted one-half inch above the level of the ratchet-wheel, leaving only three-eighths of an inch of the pawl for possible engagement with any one of the cogs of the ratchet-wheel. There is no testimony in the record showing whether this looseness of the pawl is coincident with the assembling of the pawl-plate, or whether it was the result of long-continued use. ■ It is sufficient to say that the looseness and possible variation of the pawl in its operation, by reason of the manner of its assembly and what would be the result of long-continued use, were matters for the jury to take into consideration as to whether an assembly which would permit the pawl to rise a trifle more than one-half of its width above the level of the ratchet-wheel was a defective or inefficient appliance, in view of the fact that long-continued use would tend to smooth off the lower portion of the pawl and the upper portion of the cogs on the ratchet-wheel, thus increasing the liability of the pawl and the ratchet-wheel to become disengaged. In this connection the jury had a right to take into consideration the extremely hazardous position of the brakeman when operating a brake such as the one involved in this action. The plaintiff, of course, assumed the risk of operating the brake as located, but he did not assume any additional hazard by reason of any looseness, defect or inefficient brake assembly. Whether the looseness of the pawl which we have mentioned, the possibilities and probabilities of its being worn on the lower side engaging in a cog on the ratchet-wheel worn on the upper side

added to the hazard of setting and unsetting the brake, were all questions of fact for the jury to determine.

As to the position of the pawl just before it became disengaged with the ratchet-wheel, the appellant has several times asserted that the plaintiff testified that he observed that the pawl was securely seated in the teeth of the ratchet-wheel. This statement is not exactly warranted by the testimony. We quote from the transcript as follows: "Q. And was the pawl or dog inserted in the ratchet, and the brakes set at that time? A. Apparently it was. Q. And when you noticed the dog, so far as you could observe, how was it set? A. It was set in a normal position. . . . Q. Then, when you released that brake, you moved to the right in the direction in which you were going? A. . . . I looked down and saw that the brake was engaged, or that the dog was engaged with the ratchet. Q. Then, after observing that there was pressure on the wheel, as I understand it, you reached for your brake-club. Is that correct? A. Well, after I saw that the brake was solidly set, tightly, and that the dog was in mesh into the ratchet, then I proceeded to climb down to the brake platform."

If the pawl and ratchet on S. P. Car No. 35783 was in all respects, at the time of the accident, similar to the exhibit offered in testimony, as asserted by the appellant, then and in that case it is practically impossible to set the brake or place the foot upon the lever end of the pawl without raising the pawl at the end where it engages with the ratchet-wheel at least a half-inch above the level of the ratchet-wheel. That would be the normal position of the dog with such an assembly, and the jury with the exemplar before them, and laying a hand upon the lever-end of the pawl, and observing that the weight of the hand would raise the pawl, just as we have stated, could not come to any other conclusion than that the mere weight of the foot, even though no pressure was exerted, would cause the pawl to rise above the level of the ratchet-wheel, just as we have stated. In this particular it is argued that even though the portion of the pawl which we have stated, according to our measurement, is only three-eighths of an inch, was engaged with the ratchet-wheel, it would be physically impossible for the pawl and the ratchet-wheel to become disengaged so as to allow the brake-wheel to spin before the brakeman could anticipate the counter clock-

wise motion of the brake-wheel. But whether such an engagement of the pawl with the ratchet-wheel was such that the normal action of the brakeman in getting ready to release the brake added to the liability of the pawl and the ratchet-wheel becoming disengaged, without fault of the brakeman, was a question of fact for the jury, and also, just to what extent the pawl might be said to be overriding the ratchet-wheel.

S. P. Car No. 35783 was at least sixteen years old. Just how much service it had seen during that time does not appear in the transcript, but it may safely be assumed, and we think the jury had a right to conclude that it had traveled many miles, and that the brake had been set and unset hundreds of times.

Upon the trial of the action several witnesses were placed upon the stand by the appellant, testifying that after the injury to the plaintiff the brake assembly was examined and these witnesses testified that it operated efficiently. While most of the witnesses testified that they examined the pawl, our attention has not been called to any testimony in the record that any witness, other than plaintiff, testified to the up-and-down motion of the pawl. Some of these witnesses testified that they never saw a loose pawl or dog except on a car that had been wrecked. Without quoting the testimony we may state that at least four witnesses testified that they inspected the brake assembly on S. P. Car No. 35783 after the injury to the plaintiff, and that the brake operated efficiently, all pronouncing it an efficient hand-brake. The weight to be given to this testimony, in view of the exemplar of the brake assembly introduced in evidence, was for the jury to determine. What was or is a loose pawl, was and is a question of fact, and the weight of the testimony of a witness that a pawl is not loose when its assembly permits the engaging end of the pawl to rise a trifle more than one-half of its width above the ratchet-wheel, was for the jury. A question of fact was presented, and the finding of the jury upon that question of fact is binding upon us. The fact that no witness was introduced by the plaintiff to contradict the testimony of the defendant's witnesses that the brake assembly was in a first-class condition, does not lead to the conclusion, as urged by the appellant, that it was physically impossible for the pawl to become disengaged with the ratchet-wheel on S. P. Car No. 35783, in view of the fact that the

replica introduced in evidence exhibited what we have set forth herein. Such testimony raised only a question of fact, and the testimony of the witnesses that the brake assembly on S. P. Car No. 35783 depended not alone upon their observation, but upon their conclusions as to what constituted a first-class assembly. By calling the brake assembly on S. P. Car No. 35783 first class, of which the exemplar introduced in evidence was said to be an exact replica, did not take away from the jury the fact of determining that the assembly was not first class, or was what it should be, or was not defective or inefficient, or was not such as to add to the hazards of the plaintiff's employment a hazard which the plaintiff did not assume.

Upon the trial of the action there was introduced in evidence a bulletin issued by the Interstate Commerce Commission, giving an analysis of accidents to employees while operating hand-brakes for the year 1933. That analysis shows that eighty-nine employees were injured in connection with the use of hand-brakes, sixty-eight where it is alleged that no defects appeared, and twenty-one by reason of pawl or ratchet defects, or failure thereof. Whether this table is accurate or inaccurate as to the causes of the injuries of the employees, it does establish the fact that the operation of the hand-brakes is exceedingly hazardous, and enforces upon railroad companies the necessity of maintaining appliances so as to not add to the extreme hazardousness of a brakeman's duties, that is, all reasonable care must be taken.

We may here add that if the bolt passing through the housing holding the pawl in position becomes worn by constant use, the pawl would be permitted to rise still higher at the end where it is intended to engage with the cogs on the ratchet-wheel. Our attention has not been called to any testimony in the record showing that the bolt passing through the pawl, which acts somewhat in the nature of a fulcrum, had ever been replaced by a new bolt after the car had been placed in service, which the record shows was at least sixteen years prior to the eleventh day of January, 1934.

Our attention is called to some statements made by the plaintiff after the injury, in which it is asserted that the plaintiff stated that the brake-club gave him a dirty crack. That does not in any particular contradict any testimony tending to show that the pawl on the ratchet-wheel became

disengaged. A witness by the name of Sullivan testified that the plaintiff stated to him that he did not know what caused the accident. This was shortly after the injury, and during the time when other witnesses testified that the plaintiff was irrational and had not fully regained consciousness.

A witness by the name of Dr. Walker testified that the plaintiff was irrational and had a partial lapse of memory during the weeks that he spent at the Southern Pacific Hospital, to which hospital the plaintiff was not removed until several days after the injury. The witness Stevens testified that the plaintiff said he had been "knocked from the car by a brake-stick". That does not militate against the plaintiff's testimony. The statement made by the plaintiff when he was lying on his back in the Southern Pacific Hospital is as follows: "Just as I was going to release the brake with the club, it evidently let go and the brake-club must have struck me on the side, throwing me off the platform. I was knocked unconscious." These answers were taken down by the witness Lloyd, made out in his own handwriting, neither read by, nor read to, nor signed by Karberg. These were matters, again, for the jury, and we do not think them of sufficient importance to demand further attention.

■ Counsel, both for the plaintiff and the defendant, have cited and quoted at length from a large number of cases. We have selected the leading cases on both sides which illustrate the law involved and obviate the necessity of here reviewing at length the large number of cases cited.

In *Qualls* v. *Atchison, T. & S. F. Ry. Co.*, 112 Cal. App. 7 [296 Pac. 645], this court had before it section 11 of title 45, U. S. C. A., where it is specified: "That it shall be unlawful for any common carrier, subject to the provisions of this chapter, to haul, or permit to be hauled or used on its line, any car . . . not equipped with secure . . . and efficient hand-brakes." Without quoting the cases there cited, this court held, basing its decision upon a large number of cases, that: "It is the absolute duty of an interstate railroad company to equip and maintain efficient brakes", etc. Also, that whether the defect, act of negligence, etc., complained of was the proximate cause of the injury was a question for determination by the jury.

The leading case cited by the plaintiff is that of *Didinger* v. *Pennsylvania Ry. Co.*, 39 Fed. (2d) 798. That case involved

injury resulting from the pawl and ratchet-wheel becoming disengaged. A verdict was directed for the defendant upon appeal and the judgment was reversed. We quote therefrom the following: "There are two recognized methods of showing the inefficiency of hand-brake equipment. Evidence may be adduced to establish some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner. (*Altman* v. *Atlantic Coast L. R. Co.*, 18 Fed. (2d) 405 [C. C. A. 5].) The plaintiff adopted the latter method of proof. By the opening statement he offered to show by evidence that, in a switching operation, he was required to firmly set the brake upon a freight car; that in doing so he placed his foot against the dog, and it 'went in' (the ratchet), and he heard it click; seeing that the brake held after it was set, and preparatory to leaving the car, that he placed his hand lightly upon the top wheel, when the brake suddenly 'gave way', 'swung around the other way', and, as he tried to hold it, threw him from the car; and that the brake was set 'in accordance with the proper and usual manner of setting the brake, and it gave way and did not hold'. In view of the frequently repeated assertion that the brake had been properly set and that the dog or pawl had firmly engaged one of the teeth of the ratchet, it cannot be assumed that this was a case of so-called 'hair-trigger' setting, where the dog lodges insecurely upon the outer extremity of a ratchet tooth." It will be noted that the court quotes the testimony of the plaintiff to the effect that the pawl or dog had been firmly engaged with one of the teeth of the ratchet, and therefore it could not be assumed that it was a case of so-called "hair-trigger" setting. In the case at bar, as we have shown, the testimony does not show that the pawl had been firmly engaged or securely engaged with the ratchet-wheel, as argued by the appellant, and that under the circumstances, by reason of the looseness of the pawl and its capability of rising a trifle over half its width above the ratchet-wheel, presented at all times the possibility and probability of a "hair-trigger" setting of the brake. The court further said, however: "Assuming the proper setting of the brake, the fact that it did not hold demonstrates its inefficiency." (Citing cases.)

The next case which we will consider, cited by the plaintiff, illustrating the rule of law which we think applicable here, is that of *Detroit T. & I. Ry. Co.* v. *Hahn,* 47 Fed. (2d) 59, from which we quote the following: "It is insisted for appellant that the case is governed by *Chicago, M. & St. P. Ry. Co.* v. *Coogan,* 271 U. S. 472 [46 Sup. Ct. 564, 70 L. Ed. 1041], since all the inferences which the jury might reasonably draw from the evidence would not be sufficient to support a finding of a cause of injury other than the negligence of the appellee in failing to apply the brake. We do not think the evidence falls within this rule, nor do we think it leaves the cause of injury in the realm of conjecture, as was the case in *Northern Ry. Co.* v. *Page,* 274 U. S. 65 [47 Sup. Ct. 491, 71 L. Ed. 929], and *Burnett* v. *Pennsylvania R. Co.,* 33 Fed. (2d) 579 (6 C. C. A.). If there was an inefficient brake which caused the injury, there is inescapable liability under the Safety Appliance Act (45 U. S. C. A., sec. 1 et seq.). The appellant introduced evidence which would have supported a finding for it on that issue, that is, evidence that the brake was examined before and immediately after the accident, and found to be in good working order. We are asked to accept that evidence as conclusive. This we cannot do, for the evidence of appellee that the brake was used in the normal and usual manner and failed to work, was such evidence of inefficiency as to make an issue for the jury. *Didinger* v. *Pennsylvania R. Co.,* (C. C. A.) 39 Fed. (2d) 798." The decision in this case conclusively answers the contention of the appellant that the jury should have been, and this court is bound by the testimony of the witnesses introduced by the appellant that the brake assembly on S. P. Car No. 35783 worked efficiently after the injury sustained by the plaintiff. The function of a jury cannot be eliminated in such manner.

The appellant cites a number of cases where the testimony was held insufficient to justify a verdict in favor of the injured employee, two of which we may consider as illustrating the appellant's contention, which we think inapplicable to the circumstances presented by the record in this case.

In *Burnett* v. *Pennsylvania Ry. Co.,* 33 Fed. (2d) 579, it was held that where proofs of an injury to a railroad brakeman, though consistent with the existence of a defect in the hand-brake as the cause of the accident, were at least equally consistent with the existence of some other equally effective

cause, there was no question for the jury. A quotation from the opinion in that case differentiates the facts from what we are considering, very plainly, to wit: "It is plain enough that this reverse spinning, thus happening, if in any way abnormal, must have been the direct result of an overtight setting by the employee who had previously set this brake. Certain possible defects in a brake assembly might or might not contribute to an overtight setting; whether there was such a defect here is a mere matter of surmise. In any event, according to plaintiff's testimony, and if there was an extreme and dangerous tension on the brake chain, he increased that tension by the exertion of the necessary physical strength, and then released the dog. It is impossible to see how there was any direct causal relation between the brake defect, if there was one, and the supposedly dangerous tension which caused the injury to Burnett. His own voluntary act increased that tension before it took effect." There is nothing of that kind in the instant case. The act of the plaintiff did not increase the tension, but was calculated, on the other hand, to prevent, if it had any effect, the disengaging of the pawl from the ratchet-wheel.

The case of *Grand Trunk Western R. Co.* v. *Holstein,* 67 Fed. (2d) 780, where the testimony was held insufficient to raise an issue, is cited by the appellant to support its contention that the evidence here is likewise insufficient. It will be observed that in this case the case of *Didinger* v. *Pennsylvania R. Co., supra,* and the case of *Detroit T. & I. R. Co.* v. *Hahn, supra,* are approved and distinguished from the Holstein case. In the Holstein case the following principle of law is laid down, as shown by the following quotation, and likewise, its inapplicability demonstrated, to wit: "From this it would seem that the finding of inefficiency was even there founded upon an inference of physical defect, to be drawn from the abnormal action of the brake under normal conditions; but if the plaintiff in this case must rely upon an inference of physical defect, he cannot recover. It is a familiar principle that if several inferences are deducible from the facts shown, and such inferences are equally consistent with all of those facts, a verdict in favor of the party bound to maintain one of those propositions against the other is necessarily wrong. . . . No jury should be permitted to draw a conclusion from the evidence when the proper conclusion to be drawn lies

wholly within the realm of speculation and conjecture. The principle above referred to is ordinarily applied where either one of two conclusions may just as logically be drawn from the same set of circumstances. In such case there is no conflict of evidence.''

In the case at bar there is direct evidence as to the failure of the brake assembly to operate properly. There is not one word of evidence in the record,—at least no testimony to which our attention has been called,—indicating, or even tending to indicate that the plaintiff had performed any act in connection with the brake in question, other than that which was proper and in accordance with the necessary procedure in making preparation for the release of the brake on S. P. Car No. 35783. There is direct testimony as to the condition of the brake assembly and how it acted. There was, as we have stated, introduced in testimony an exemplar of the brake assembly, said to be an exact replica. This testimony and the replica in the condition which we have pointed out, justified two conclusions, either one of which would hold the defendant liable, to wit: Either that the pawl on the brake assembly on the car in question was so loose as to allow it to override the cogs on the ratchet-wheel; and likewise, that it was so loose that in the setting of the brake the pawl would necessarily rise so that more than one-half of the pawl would be above the level of the ratchet-wheel, and cause the brake unexpectedly to let go. In this connection it must be remembered, also, that the car had been in service over sixteen years. There is no speculation presented by the testimony in this case. The foregoing are simply legitimate inferences which the jury was warranted in deducing from the facts presented for its consideration. A number of other cases are cited by the appellant along the same lines as the two cases just considered, and therefore do not need to be reviewed herein.

The alleged misconduct of counsel in argument does not appear to merit any setting forth in this opinion.

■ Following the alleged insufficiency of the testimony, it is urged that the court was guilty of prejudicial misconduct in its instructions to the jury. At the request of the plaintiff the court gave to the jury the following instruction, being instruction No. XVIII:

"The duty imposed upon the carrier by the Safety Appliance Act to equip its cars with efficient hand-brakes is a duty to maintain such brakes in an efficient condition. The test of the observance of this duty imposed by the Safety Appliance Act is the performance of the appliance. A failure of the appliance to work efficiently will sustain a charge that the act has been violated, and render the carrier liable for an injury which results from such failure."

At the request of the appellant the court gave to the jury instruction No. XXVII, reading as follows:

"The Safety Appliance Act provides that all cars shall be equipped with efficient hand-brakes. To be efficient the hand-brake must be capable of operation and kept in such condition that it shall at all times be operative, and, therefore the test of compliance with the requirement of the statute is primarily effectiveness in operation and the question is whether or not it was able to produce the expected result when properly applied and if it was so effective then, it would be deemed efficient."

Following the case of *Devaney* v. *Atchison, T. & S. F. R. Co.,* 219 Cal. 487 [27 Pac. (2d) 635], it must be held that instruction No. XVIII given to the jury at the request of the plaintiff is not a strictly correct statement of the law. That instruction should have read in the last sentence as follows: "A failure of the appliance to work efficiently when properly operated will sustain a charge that the act has been violated, and render the carrier liable for an injury which results from such failure." The words "properly operated" should have found a place in the instruction, just as appears in instruction No. XXVII. This, however, does not establish the fact of prejudicial error, because in the light of the testimony to which we have referred concerning the conduct of the plaintiff in making preparations to release the brake, there does not appear one scintilla of testimony indicating that so far as the plaintiff was concerned, what he did, or was doing, was other than proper and strictly in accordance with the customary procedure necessary to be taken in the performance of his duties. Thus, if a special interrogatory had been submitted to the jury, and the jury had found improper conduct on the part of the plaintiff, this court would then be under the necessity of setting aside such a finding on the ground of its being unsupported by the testimony. No preju-

dicial error can be based upon any such state of facts. Section 4½ of article VI of the Constitution forcibly applies to this case.

Appellant concludes its argument by combining two objections, to wit: That the damages are excessive; and that the plaintiff, by refusing to be operated upon, added to the extent of his own injury.

In support of its contention that the award is excessive, the appellant sets forth the following calculations, to wit:

"If we take the sum of $2,076.00 per annum for 26 years, which was the expectancy of the plaintiff, we would obtain a total of $53,976.00, which divided by 256 ($1.00 plus $1.56) which is 6 per cent for 26 years, would result in $21,000.00 as the amount allowable as the present cash value of future earnings. Certainly, an allowance of that amount additionally for pain and suffering seems to be excessive. . . . Counsel have taken the pains to figure $42,500.00 at 4 per cent for 26 years, making allowance of $2,076.00 per annum for the full period of 26 years from principal and interest, and finds that at the end of the 26 years after using the interest and sufficient of the principal to make up the annual earnings, the amount remaining in the fund would be $20,825.00."

This first calculation, of course, is based simply upon the cash value of the plaintiff's prospective earnings, and does not take into consideration the pain, suffering, and continuing disability of the plaintiff, which at least presented to the jury a very serious question as to what would compensate an injured person for a lifetime disability. As has been said in many cases, the jury is as well qualified to estimate such damages as is an appellate court. Our attention has not been called to any fact indicating that the verdict of the jury was the result of passion, prejudice or undue influence. Just a plain argument that the extent of the injuries are not sufficient to justify the amount of the award.

While it would unnecessarily extend the length of this opinion were we to set out all of the testimony relating to the injury, we may begin by stating that the plaintiff suffered a very extensive fracture of the skull, and an injury to the brain which has affected his mental operations, in all probability disabled him for life and rendered him incapable of performing any labor by which to maintain himself, and

likewise rendering him to some extent mentally incapable. As one of the witnesses testified, he is unable to concentrate and can do no work whatever. The plaintiff was under hospital treatment from the entire date of the injury on January 11, 1934, up to and including the date of the trial in 1935. The plaintiff's weight had dropped from 187 to 139 pounds; he had been in bed most of the time during the year intervening between the injury and the trial; suffered very severe headaches. Even the doctors for the plaintiff admitted the fracture of the skull and the suffering of a moderately severe concussion of the brain. The severity of the injuries suffered by the plaintiff does not seem to be seriously questioned. ■

The most serious question was as to whether the plaintiff's injury could or could not be alleviated by what we may call experimental operations performed upon his skull. Dr. Towne, one of appellant's witnesses, testified that concussion of the brain involved actual brain injury, but testified that in his opinion, while the plaintiff was gradually growing worse, his condition could be bettered by an operation being performed to remove what he assumed to be a blood clot upon the brain.

It appears from the record that the operation sought to be performed was that of boring holes in different portions of the skull for the purpose of determining the location of the blood clot, if any, upon the brain, and then draining off the blood through the hole locating the blood clot. Just how many holes would have to be bored in the skull, the record does not disclose, but it does appear that the idea of the surgeons was that holes should be bored in the skull until the blood clot was located. The testimony is to the effect that this exploratory operation was not attended with more than a five per cent mortality. Dr. Ruedy, who examined the plaintiff, testified in his behalf as follows: "In addition to the fracture of the left parietal bone of the skull, plaintiff has sustained the following head injuries as a result of the accident: A traumatic separation of an area of the inner table of the parietal bone with medial displacement; traumatic opening of the sagittal and occipital-parietal suture line; overlapping of the outer table of the left parietal bone upon the right parietal bone; development of an increased inter-cranial pressure; severe cerebal injury." It was next explained how these injuries interfered with the movement of the plaintiff's

body, causing him to have a staggering gait, making him feel like he was falling; and also the effect upon the nervous system or nerve centers. The consensus of opinion of all of the doctors was that unless the proposed operation was performed, the plaintiff's condition would become worse.

While the appellant has cited a number of cases to the effect that under ordinary conditions a plaintiff was bound to take such action as seems proper to mitigate damages by lessening the extent of his injuries, the following cases lead us to the conclusion just as was said in the case of *Murray* v. *Cohen*, 4 N. J. Misc. 139 [122 Atl. 221]: "A plaintiff cannot be compelled to submit to an operation which involves the least danger to life." (*Sarcady* v. *Biedenway*, 116 Cal. 581 [3 Pac. (2d) 43]; *Wells* v. *Clark & Wilson Lumber Co.*, 114 Or. 297 [235 Pac. 283].)

We cannot hold that the plaintiff in this case was under obligations to submit to the boring of holes in his skull for the purpose of locating a blood clot upon his brain, when that operation was attendant upon fatal possibilities.

In answer to the appellant's calculations, the respondent sets forth the following: "$173.00 is the amount that appellant *admits* that Karberg earned per month. Karberg testified that during good times he earned as high as $300.00 per month, and in poor times, not less than $200.00. His average earning can therefore be stated to be $250.00 per month. Figuring the present worth of an annuity of $250.00 per month for twenty-six years, at 3 per cent, we get the sum of $43,820.00."

Were there no financial losses incurred by the plaintiff, the facts that his whole life is ruined; that his mental capacities are so lessened as to render him incapable of engaging in any gainful undertakings; and that his whole life, if it extends through the period of normal expectancy, must be one not only clouded, but practically a continued hopelessness, present a condition that can scarcely be compensated by any monetary consideration.

The judgment is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 16, 1936.