**OZARK AIR LINES, INC., Appellant,**

v.

**Robert C. LARIMER, Appellee.**

**No. 17899.**

United States Court of Appeals
Eighth Circuit.

Oct. 11, 1965.

John J. Vizintos, of Shull, Marshall, Mayne, Marks & Vizintos, Sioux City, Iowa, George F. Madsen, Sioux City, Iowa, for appellant.

Warren G. Dunkle, of Gill, Dunkle & Beekley, Sioux City, Iowa, Franklin E. Gill, Sioux City, Iowa (Deceased), for appellee.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Dr. Robert C. Larimer brought this diversity action against Ozark Air Lines, Inc. (Ozark) to recover for personal injuries sustained in a fall while boarding Ozark's DC–3 at the Sioux City, Iowa airport. The case was tried to a jury in the District Court for the Northern District of Iowa who awarded Dr. Larimer $9,139.00.

Ozark urges as error (1) the District Court's refusal to grant its timely motions for directed verdict and for judgment notwithstanding the verdict and (2) the admission of Dr. Larimer's hearsay testimony that on a date subsequent to his accident a third person had also fallen while using similar steps on another of Ozark's aircraft. We agree with Ozark that the motion for directed verdict should have been granted.

There is little conflict in the evidence. Dr. Larimer went to the Sioux City airport about 7:00 a. m. on Sunday, January 28, 1962, to board Ozark's flight No. 120 for Des Moines, Iowa. After visiting with friends and having a breakfast snack, Dr. Larimer and two acquaintances, also passengers on the flight, walked to the plane and en route were engaged in conversation. Dr. Larimer proceeded up the steps first. The crew was already aboard and the stewardess was at her station inside the entrance of the plane to greet the passengers and glance at their boarding passes. It was a bright, sunshiny morning, but cold. Dr. Larimer carried a brief case and gloves in his left hand, and as he ascended the steps reached into his inside coat pocket with his right hand for his boarding pass. As both hands were thus occupied, Dr. Larimer could not use the hand rails. Upon reaching the top step, Dr. Larimer somehow got his foot into a space to the side of the top step between the door and the fuselage of the plane, causing him to lose his balance and fall backwards, breaking his leg. He was carried to the Terminal Building where first aid was administered by an orthopedic surgeon, who was awaiting another flight. Dr. Larimer was then taken by ambulance to a hospital.

The aircraft involved was one of approximately twenty-five DC–3's being operated by Ozark at the time of the accident and was the same type plane Ozark had used since commencement of business in 1950. In 1952 Ozark had installed in all DC–3's airstair doors which were developed and manufactured by a California concern. Prior to this development, the DC–3's had used portable landing steps which were manually wheeled out to the planes. The airstair doors were aproved by the Civil Aeronautics Administration (now Federal Aeronautics Administration), and are used by all of the feeder lines in this country flying DC–3's. In 1962 approximately six hundred were in operation.

In the past four years Ozark has averaged loading four hundred fifty thousand passengers per year on its fleet of DC–3's. In 1962 some eighteen thousand, two hundred had used this particular plane and airstair steps exactly as it was equipped on the day of the accident. There has been no reported accident resulting from a fall on the steps by any of Ozark's passengers using the airstair door.

Basically, the airstair door is a section of the fuselage that fits the entrance opening to the aircraft with steps being installed on the inside of the fuselage contour. There are five steps constructed much in the same fashion as a ladder. The steps are equipped with a hand rail made of steel cable covered by surgical tubing. Metal stanchions support the cable. The thus constructed hand rail is

thirty-two inches above the top of the steps and becomes taut when one places his weight on the steps. The steps are parallel to the ground but the forward hinge is a few inches longer due to the plane's resting at a three point tail-wheel position with the forward or nose more elevated than the rear. The maximum opening between the door and the forward hinge is about one and one-half inches. The top step is approximately two inches wider than the lower ones. The steps are also equipped with a metal tubular "snubber" that extends from the door opening on the fuselage to the top forward corner of the airstair doors which "snubs" or breaks the fall of the door when it is opened. The "snubber" arm is about six to eight inches away from the fuselage at the bottom of the door opening.

A daily preflight inspection is made by the pilot prior to his acceptance of any aircraft. No defects in the stairs were noted or reported for either the day of the accident or the days before and after. Additionally, the aircraft is checked by experienced, certified mechanics approved by the Federal Aeronautics Administration. The last such mechanical inspection was made on January 19, some eight days prior to the accident. On that date the airstairs were repainted with an anti-skid paint. This particular aircraft was in Sioux City overnight and early on the morning of the accident was preheated and the airstair door opened and swept. There was no foreign matter on the steps.

In response to the doctor's inquiry of "how did it happen?", Dr. Larimer replied, "Just awkwardness, I guess." The above testimony is virtually undisputed although there is conflicting testimony as to whether Dr. Larimer and his companions were continuing their conversation as they ascended the steps.

■ Because jurisdiction is here based upon diversity of citizenship, the question arises whether to apply a state or federal test of sufficiency of the evidence to support a jury verdict. In Dick v. New York Life Ins. Co., 359 U.S. 437, 444–45, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), the Supreme Court acknowledged the question but declined decision until more critically presented. When before this court, either the parties have assumed that the state law controlled or we have found the state and federal standards to be without appreciable difference. Jiffy Markets, Inc. v. Vogel, 340 F.2d 495, 498 (8th Cir. 1965) and cases there cited; United States Rubber Co. v. Bauer, 319 F.2d 463 (8th Cir. 1963); Bankers Life & Cas. Co. v. Kirtley, 307 F.2d 418 (8th Cir. 1962). We have had previous occasion to examine the Iowa and federal test of sufficiency of the evidence to support a jury verdict and have held them to be substantially the same. Bankers Life & Cas. Co. v. Kirtley, supra; see Ford Motor Co. v. Mondragon, 271 F.2d 342 (8th Cir. 1959). In both there must be substantial evidence to support the verdict. Brady v. Southern Ry., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); Klunenberg v. Rottinghaus, 129 N.W.2d 68 (Iowa 1964); Ellingson v. Kramer, 255 Iowa 1257, 125 N.W.2d 777 (1964).

■■ In considering the sufficiency of the evidence, all facts which plaintiff's evidence tends to prove must be assumed to be established and all inferences fairly deducible from such facts must be drawn in plaintiff's favor. Wilkins v. Kendle, 287 F.2d 201, 202 (8th Cir. 1961); Chicago Great Western Ry. v. Scovel, 232 F.2d 952, 955 (8th Cir. 1956), cert. denied, 352 U.S. 835 (1956); Chicago, Rock Island & Pac. R. R. v. Lint, 217 F.2d 279, 282 (8th Cir. 1954). And it is generally conceded that a carrier is required to exercise the highest degree of care to avoid injury to passengers boarding one of carrier's vehicles. See Fitzgerald v. Des Moines City Ry., 201 Iowa 1302, 207 N.W. 602, 603 (1926); Dieckmann v. Chicago & N. W. Ry., 145 Iowa 250, 121 N.W. 676, 679 (1909).

■ When the evidence is so favorably viewed from plaintiff's standpoint, yet fails to establish a quantity of evidence reasonably supporting the verdict, it then becomes a reviewing court's duty

to reverse. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Brady v. Southern Ry., supra.

The physical facts in this case are not in dispute. In relation thereto, Dr. Larimer's evidence went only to a description of the airstair door and its attachment to Ozark's DC–3. No evidence was adduced indicating that the construction or attachment of these airstairs differed either from those used on Ozark's other aircraft, or by domestic feeder lines or by the major trunk airlines prior to phasing out the DC–3's. Nor is there any evidence that a safer means to board passengers exists or is available.

Dr. Larimer insists that the steps were makeshift and had no sides.[1] Contrarily, the evidence is undisputed that the steps were developed and manufactured by a California concern for this particular type plane and have been successfully used at least since 1952. They were completely acceptable by the industry and were approved by the appropriate federal authorities. A physical description of the airstair door and the steps portray a uniform set of mechanically sound steps properly attached to the plane's fuselage.

The top step was completely corrugated and two inches wider than the steps below it and protected by a hand rail as were the other steps. It was pointed out that a small open space between the fuselage and the top step was created by the forward hinge being slightly longer than the rear hinge. This condition, however, was outside of the steps and to the right of the forward hinge. In order to encounter this space, one would have to place his foot completely outside the width of the step and towards the forward part of the plane. There would have been no danger or accident if Dr. Larimer had in fact continued to use the steps rather than step outside their width.

It is argued, though not seriously, that Dr. Larimer experienced a "jiggle" when the enplaning passengers behind him began ascending the steps. This "jiggle" was the "snubber" apparatus allowing the steps to become completely stationary and solid. As previously mentioned, this precautionary contrivance prevents the airstair door from making ground contact until a person puts his weight on the steps. There is no suggestion in the evidence that this condition had anything to do with Dr. Larimer's fall. Significantly, in describing the steps, Dr. Larimer pointed out that, "they did not differ as far as [he] could see from any other steps on the DC–3 type airplane which [he] had climbed before." Dr. Larimer testified that he had boarded this type plane possibly eight, ten or a dozen times before without any trouble in negotiating his way into the aircraft.

Dr. Larimer's only other contention as to an ingredient of negligence is that the stewardess placed herself in a position to distract him. There is no record evidence to support any such assertion.[2]

---

1. Dr. Larimer described the steps in the following language:

"The steps, of course, are level and horizontal as proper steps ought to be, but as I mentioned, the airplane slants from front to back so there is quite a difference in the height of the step that one has to take between the top step of the stair case and the plane. In other words, the difference between front and back as the plane of the staircase is considerable. The hatchway itself, is not a square door, it is rounded considerably at the corners so that the hinges are set well inside and they are not right at the corners of the door but they set in about a third of the way each, and because of the difference in height of the plane, the rear hinge is a fairly short hinge and the forward hinge is fairly considerably sized. Likewise, because of the grounding of the door, and the fact that the plane slants, when the door is down in position for people to climb up into the front of the leading edge, the front edge of the door sits away from the plane by, oh, three or four inches, perhaps more, whereas the rear edge of the door is pretty much tight against the plane."

2. Dr. Larimer's testimony indicates that the stewardess was in her usual posi-

Thus, a careful review of the record evidence supplies us with nothing to support Dr. Larimer's assertion that the construction and installation of the steps coupled with distraction by the stewardess constitute evidence of negligence that will justify the jury's verdict. Dr. Larimer was an experienced air traveler. He had boarded many types of aircraft and was familiar with the airstair doors, having used them on DC-3's before. It is undisputed that this type airstair door met with government approval and had been used by millions of passengers without reportable injury. The only reasonable conclusion that can be drawn from the evidence is that Dr. Larimer made a misstep over and outside the top step.

Negligence is a broad term not easily defined. Neither is it always actionable. Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930); McDonald v. Chicago & N. W. R. R., 26 Iowa 124 (1868). Actionable negligence, however, presupposes some fault or substandard of care. Northern Ry. v. Page, 274 U.S. 65, 47 S.Ct. 491, 71 L.Ed. 929 (1927); Reynolds v. Great Northern Ry., 69 F. 808 (8th Cir. 1895). The fact that there might be a safer method than was employed or that the danger might have been avoided if a different manner was utilized does not in and of itself constitute actionable negligence. Baltimore & O. R. R. v. Groeger, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419 (1925); McGivern v. Northern Pac. Ry., 132 F.2d 213 (8th Cir. 1942).

In light of the facts here, Ozark could hardly be held to foresee or anticipate such an accident as this. There was no foreign matter on the steps, Dr. Larimer did not slip, the steps were equipped with hand rails but he did not use them, and there was no mechanical or structural defect in the airstair door, and a safer method for enplaning passengers is hardly conceivable.[3] When a method has been followed safely for a considerable period of time without creating danger or causing injury, conformity to such a method may properly be regarded as reasonable care. Metropolitan Coal Co. v. Howard, 155 F.2d 780 (2nd Cir. 1946).

Despite the presently articulated philosophy to the contrary in some neo-legal circles, there are, under the legalese *damnum absque injuria,* many instances of injuries to persons for which the law furnishes no recovery in damages. A careful review of the record indicates a complete absence of any evidence that would entitle a jury to find negligence. Dr. Larimer's fall was most unfortunate but we can only conclude from the testimony and exhibits that it was occasioned solely by his misstep off the top step in the direction of the nose of the plane rather than towards the entrance. Under the circumstances, it is our proper function to so rule. Reuter v. Eastern Air Lines, 226 F.2d 443, 445–46 (5th Cir. 1955).

tion and that he was not distracted by her presence:

"Q. And you had boarded DC-3's there other than this particular morning, had you not?

"A. Yes.

"Q. And had you seen stewardesses in the same position as you saw this particular stewardess on the 28th of January?

"A. Yes.

"Q. So that as far as her position was concerned it was not at all unusual to you.

"A. It was not surprising to me, no.

"Q. You expected to see her there?

"A. Yes.

"Q. As a matter of fact you knew she would be there.

"A. Well, the stewardesses at that time usually stood within the door, yes.

"Q. At least as you started up the steps you knew there would be a stewardess inside the airplane who would ask you for your boarding pass.

"A. Yes, since she wasn't at the bottom of the steps."

3. Some airlines use mobile stairways pushed to the side of the plane's fuselage by ground employees, but such arrangement is subject to human error and in case of a crew's carelessness can result in injury. See Weller v. Northwest Airlines, 239 Minn. 298, 58 N.W.2d 739 (1953).

■ The remaining issue deals with the admission of hearsay evidence. We can but rule that this error was prejudicial; however, it would serve no purpose to discuss it.

The judgment of the District Court is set aside and the case is remanded with instructions to enter a judgment for Ozark.